**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| JAKE ELROD and ERIC JENKINS | ) | |
| | ) | DOCKET NO. 1:24-cv-278 |
| Plaintiffs, | ) | |
| | ) | JURY DEMANDED |
| v. | ) | |
| | ) | McDonough / Dumitru |
| THE CITY OF SODDY DAISY, | ) | |
| TENNESSEE, a municipality, | ) | |
| | ) | |
| BURT JOHNSON, individually and in his | ) | |
| official capacity as the City Manager for the | ) | |
| City of Soddy-Daisy, | ) | |
| | ) | |
| BILLY PETTY, individually and in his | ) | |
| Official capacity as the Police Chief for the | ) | |
| Soddy-Daisy Police Department, | ) | |
| | ) | |
| MIKE SNEED, individually | ) | |
| | ) | |
| Defendants. | ) | |

---

### Plaintiff's Response to Motion for Summary Judgment

---

### I. Introduction

Soddy Daisy warned officers Jake Elrod and Eric Jenkns not to give impeachment testimony against fellow officer Jeremy Wright, suspended them hours after they defied that warning, and fired them soon afterward. And yet the City claims that no reasonable juror could find retaliation in this case. Instead, according to the City, every potential juror would agree that the terminations were justified by far-reaching misconduct that dated back months. Elrod and Jenkins had a history of demeaning others in the department. They stonewalled the City Manager who sought their advice about a staffing issue. And they lied to a Criminal Court judge when they gave their impeachment testimony as part of an elaborate plot to ruin Wright's career.

But the City did not support that argument by disproving the sufficiency of the Plaintiffs' evidence. In fact, the City didn't even deal with much of it. Instead, its argument is simply that, because it has offered alternative explanations for the Plaintiffs' termination—often supported by testimony from its own witnesses—the Plaintiffs' claims fail as a matter of law.

That is not nearly enough to entitle the City to the relief it seeks. The City's proffer of non-retaliatory reasons for Elrod and Jenkins's firings does not end the litigation merely because those reasons exist. It instead shifts a burden to the Plaintiffs that courts widely recognize to be relatively minor—they must produce proof that casts some doubt upon the City's explanations. In other words, they need not prove that the City's reasons are pretextual but rather show that a reasonable juror might not believe them.

In this case, there is ample evidence that creates doubt about each of the non-retaliatory reasons that the City has offered for the Plaintiffs' terminations:

- The City claims that it fired Elrod and Jenknis because they had demeaned other officers. But the alleged complaints about demeaning conduct predate the Plaintiffs' terminations by over seven months, there are no records of any formal interviews or investigations into those alleged complaints, one of the Plaintiffs was promoted months after those complaints allegedly began, and the complaints also implicated a third officer who the City did not discipline in any way.

- The City claims that it fired Elrod and Jenkins because they lied when they gave their impeachment testimony about Wright. But the Hamilton County judge who heard their testimony also heard competing testimony from one of the Defendants in this case that supported the City's position, and the judge found that Elrod and Jenkins' testimony was "significantly credible" nonetheless.

- The City claims that it fired Jenkins for not being candid with the City Manager in a discussion about staffing. But the City did not cite that as a reason for its decision to suspend Jenkins before his termination, and the City Manager told Jenkins that his job security hinged only upon the impeachment testimony he might give against Wright.

- The City claims that the Plaintiffs' firing had nothing to do with their decision to give impeachment testimony. But the Chief of the Soddy Daisy Police threatened Elrod and Jenkins over their desire to disclose the impeachment evidence. And the timing of the City's actions against Elrod and Jenkins proved that the threat was not empty— the City suspended them hours after they gave their testimony and it fired them less

than two weeks after a judge ruled that their testimony justified the new trial of a person that Wright had arrested.

Having provided more than enough evidence to cast a reasonable doubt upon the City's non-retaliatory explanations, the lone issue remaining for the Court to consider is whether to grant Mike Sneed summary judgment on the Plaintiffs' claims that he conspired with the City to violate the Public Protection Act or the Public Employee Political Freedom Act. The Court may easily dispose of this issue due to the Defendants' failure to brief it. They argued only that the intracorporate conspiracy doctrine immunizes the "individual Defendants" from conspiracy to violate those Acts. But Sneed is not a City employee so the intracorporate conspiracy doctrine does not apply to him.

Even if Sneed had argued more than that, though, the Plaintiffs' conspiracy claims would still survive. There is evidence from which a jury could conclude that Sneed either participated in, assisted, or encouraged the City to terminate the Plaintiffs, such as proof that he met or spoke with the City's decisionmakers multiple times regarding the Plaintiffs—including on the day of their suspensions—and told them that the Plaintiffs didn't deserve to have their badges after all that they'd said and done.

## II. Background

### A. Soddy Daisy Police officers Elrod and Jenkins investigated allegations of sexual misconduct against fellow officer Jeremy Wright, and Elrod discovered graphic text messages from Wright about sexual fantasies involving "young" people.

In 2023, Lieutenants Jake Elrod and Eric Jenkins investigated Jeremy Wright, a fellow police officer in Soddy Daisy, following allegations that Wright was a pedophile. JA 80–83, 170, 175–76, 177–85. Their investigation eventually led them to speak with a local gas-station attendant, who claimed to have heard a community member discussing Wright's sexual interactions with minors. *Id.* at 80–83, 122–26, 177–85.

Upon reporting that information to Mike Sneed, Chief of the Soddy Daisy Police Department, Elrod and Jenkins learned for the first time that Wright had been the subject of similar complaints before. *Id.* at 127–29. Chief Sneed told Elrod and Jenkins that he had referred the matter to the Hamilton County Sheriff's Department for an "internal investigation" and that the Sheriff's

Department had "exonerated" Wright of any wrongdoing. *Id.*

Elrod was confused about why Hamilton County would conduct an "internal" investigation into a Soddy Daisy officer, so he contacted the Sheriff's department for more details. *Id.* An internal-affairs officer with the county Sheriff told Elrod that they had not investigated Wright, so Elrod reported that back to Chief Sneed. *Id.* at 129–31. Sneed then suggested that Elrod contact someone else with the county. *Id.*

Elrod ultimately spoke with Detective Mark Stockman with the Sheriff's office, who confirmed he had indeed investigated Wright in 2022 over allegations related to pedophilia. *Id.* at 268–72. But that investigation was not for an "internal" or administrative purpose. *Id.* at 129–34. Rather, the Sheriff's office had investigated whether to charge Wright with a crime. *Id.* And since "there wasn't enough for a criminal charge at that point," the Sheriff's office closed their investigation. *Id.*

But Stockman also noted that they had uncovered a "disturbing" batch of text communications between Wright and the person who had lodged the complaint against him. *Id.* at 129–34, 267–71. Elrod asked Stockman to send him whatever he had, and Stockman complied, emailing Elrod the texts and other items in their file. *Id.* at 132–33.

Wright's "disturbing" texts, which he sent and received in 2020, were with a woman named Sabrina Hall. *Id.* at 276–313. He and Hall were discussing the possibility of starting a sexual relationship and, after the two exchanged graphic pictures of each other, he asked Hall for details about "the freakiest thing" she'd "ever done," "legal or not." *Id.* at 284–94, 311–13. She responded that some of her sexual desires were best not disclosed "over text," but after Wright pleaded with her to reveal more, she said that liked "younger ones." *Id.* at 294.

Wright approved, responding with "Omg!!! I'm in love!!," and then asked Hall if she'd had "any experiences." *Id.* at 295 (cleaned up). "Yes," she replied, but then asked if he was "okay with it" "for real." *Id.* He was: "I wish I would have known this [a] long time ago!!" *Id.*

Hall was still nervous about revealing more, noting that she was "always scared to say anything" about this to anyone. *Id.* But Wright continued to encourage her. "Don't be" scared, he

responded, and, after warning her not to "rat" him "out," he asked her to trust him and to give him "a hint about" her "likes." *Id.* (punctuation cleaned up). He again tried to reassure her, noting that what she was revealing was "just fantasy." *Id.*

She finally gave in and, with a reciprocal warning for him not to "rat" her "out" either, said that "a younger one needs to learn, right?" *Id.* at 295–96. Wright immediately agreed, and Hall went on to describe a fantasy that involved someone younger without "experience." *Id.* at 297–98. Wright apparently shared Hall's desires, noting that he'd "never met anyone that has thoughts like me." *Id.* at 298–99. Hall, too, recognized how uncommon their shared desires were, stating further that "it's not something people are okay with you know." *Id.* at 299–301.

Wright went on to ask Hall if she had "any pictures." *Id.* at 302. She asked him to clarify whether he wanted pictures of her. *Id.* "Of anyone," he said. *Id.* She replied that she "used to have lots" of pictures, and she promised to tell Wright more when they met in person. *Id.* at 303.

But Wright continued seeking more from Hall via text and asked her whether she had any sexual experience with "a younger guy." *Id.* She revealed that she had and that it had occurred when she "was the babysitter." *Id.* That encouraged Wright further, and he expressed a desire for the two "to get together." *Id.* at 303–04.

They both again expressed how rare it was to find someone that shared their common sexual interests. *Id.* at 304–05. Wright said that he had "never met anyone that [he could] be honest with," and Hall indicated that she had "only met one person" before Wright but that she was "still [wary] about them," "[e]specially with what [she] like[s]" to do sexually. *Id.*

Wright concluded with a plea for discretion. "I have a lot to lose," he warned, and he said that "[i]f you keep your mouth shut, I will keep mine." *Id.* at 305 (cleaned up). Then, before the two went back and forth about potential times and places to meet, Wright noted his desire to engage in a sexual act that involved Hall and "a young dude." *Id.* at 305–07.

Elrod found Wright's texts to be "heinous" and provided them to Chief Sneed. *Id.* at 134–36. Sneed seemed to concur with Elrod's assessment. When Elrod asked if he "would trust his grandkids around Jeremy Wright," Sneed was unequivocal: "Absolutely not." *Id* at 136. Given that

response and other conversations he had with Sneed about the matter, Elrod believed that Wright would ultimately be fired. *Id.* at 136.

**B. Elrod investigated Wright again when a woman accused Wright of showing a nude picture of himself to her and an underage girl at a local gym, and Wright both denied the accusation and denied having any nude pictures of himself on his phone.**

Around the same time that Elrod reviewed the text messages collected by the Hamilton County Sherriff's Department, someone else made allegations against Wright involving sexual misconduct toward a minor. A Soddy Daisy police officer received a complaint from a local woman who alleged that Wright had shown "pictures of his penis to her and an underage girl at the gym." *Id.* at 137–38. The officer reported the allegation to Elrod—who was the officer's supervisor—and Elrod informed Sneed. *Id.* at 138–40. Sneed told Elrod to investigate Wright once again. *Id.* at 140.

Elrod spoke with the women who made the new accusations. She told him that she and an "underage family member" had encountered Wright at a Planet Fitness gym. *Id.* at 141. Wright told them that he was training to get into shape for a boxing match and remarked how much his routine had affected his appearance. *Id.* He then wanted to show them a "before and after" photograph, so he accessed a picture on his phone and displayed it to the woman and underage girl. *Id.* On one side of the picture, there was a photo a Wright before he began working out, and on the other side, there was a nude photo of Wright that "expos[ed] part of his penis." *Id.* The woman was "disgusted," told Wright that she "didn't want to see that," and immediately walked away with the underage girl. *Id.* at 141–42.

A couple of days after the woman told Elrod this, he contacted her again to encourage her to give a more formal interview. *Id.* at 77–79. But she declined. She had spoken with the family member who had been with her at the gym when she encountered Wright, and the family member "did not want to pursue" the matter any further. *Id.* She had apparently heard from a friend that Wright was friends with Billy Petty, who was then a Captain in the Soddy Daisy Police Department, and that Petty "would not let anything happen to" Wright. *Id.*

Elrod updated Sneed after his conversations with the woman, and Sneed asked Elrod to speak

with Wright. *Id.* at 143–44.. But their meeting, according to Sneed, should occur in a regular office, not an interview room. *Id.*

Elrod therefore interviewed Wright in his office. At first, Wright claimed that he hadn't worked out at Planet Fitness while he trained for any boxing match. *Id.* at 78. Then when Elrod relayed the allegation against him, Wright produced a side-by-side, before-and-after photo on his phone that he had indeed taken at Planet Fitness. *Id.* at 145. Wright was shirtless in the photos, but the images showed him only from the waist up. *Id.* He claimed that if he ever showed anyone a before-and-after picture, that waist-up image would have been "the only transition photo he would show to someone in public." *Id.* at 78.

Elrod then asked Wright point-blank whether "he had a picture of a penis on his phone." *Id.* at 146. Wright replied unequivocally: "No." *Id.*

## C. Wright admitted lying to Elrod during the investigation, and though Elrod and Sneed discussed the matter in detail, Wright faced no discipline for any of his actions.

Wright left his meeting with Elrod and visited Lt. Jenkins. *Id.* at 189. According to Jenkins, Wright was "visibly upset" and began "venting" about the conversation he'd just had with Elrod. *Id.*. He then began laughing and told Jenkins something he hadn't told Elrod:

```
A         I was just listening to Jeremy vent and -- and
he laughed for a second, and I looked up at him; and
he said:  "Well, what Jake doesn't know is there is
another picture on my phone, and that one has my dick in
it."
```

*Id.* at 190.

This took Jenkins by surprise. "Hold up," he said. *Id.* "There's another picture"? *Id.*

Wright replied that he didn't think that showed it to anyone, and then "quick[ly] after that," he left Jenkins' office. *Id.*

After Wright had gone, Jenkins contacted Elrod and told him exactly what Wright had said about having another picture. *Id.* at 148, 191–92. Elrod then communicated that information to Sneed, and Sneed instructed Elrod to "bring him back in the office" and meet with him again. Elrod Dep. at 149–50.

In their next meeting, Elrod told Wright that he knew he'd talked with Jenkins after their first interview. *Id.* at 151. Wright admitted that and conceded that he told Jenkins about another photo. *Id.*

He then showed Elrod the picture he hadn't disclosed before. *Id.* at 151–52. Like the other picture, it was a side-by-side comparison of photos of his body before and after his workout regimen. *Id.* 78, 151–52. But in this picture, the "after" photo wasn't from the waist up—it showed all of Wright's nude body above his knees and there was a small black spot covering his penis. *Id.* at 78. Wright's phone during this second meeting, Elrod noted, was in "picture edit mode." *Id.*

Wright then left Elrod's office and went back to see Jenkins to ask why he "ratted" on him. *Id.* at 193. Jenkins said simply that it was because Wright "lied to Jake" and explained that he "can't sit on that" type of information. *Id.* Wright apparently understood Jenkins's position because the only response he offered was, "I know. It just sucks." *Id.* And when Jenkins later asked Wright to explain why he "lie[d] to Jake," Wright again acknowledged that he was in the wrong. *Id.* at 390–91. "I don't know, man," Wright said. It must have been because he was "[s]cared." *Id.*

Elrod and Jenkins reported Wright's dishonesty to others. Jenkins spoke with Billy Petty, who was still a Captain at the time, to inform him about what happened. *Id.* at 194. When Jenkins asked why Wright would "lie to Jake," Petty said he didn't know why and offered only that it was because Wright was "an idiot." *Id.* But, Petty concluded, Wright's dishonestly ultimately "doesn't matter" since it "wasn't no IA" investigation. *Id.*

Elrod took his feedback to Sneed in the form of a written report. *Id.* at 153–54. He detailed his investigation into the Planet Fitness incident and concluded that Wright may have violated a department policy regarding off-duty conduct. *Id.* at 77–79. The report also recorded the fact that

Wright gave contradictory stories to two different superior officers when confronted with the allegations. *Id.*

Elrod was on medical leave from the police department for nearly a month after he gave his report to Sneed, but when he returned to work, he met with Sneed to express his lingering concerns. *Id.* at 155–56.. After all, the report Elrod had written before his medical leave covered only one incident and, given the other things that had come up in his investigation, Elrod was "terrified" about what the next complaint might be. *Id.*

Sneed responded to Elrod's concerns by asking for something more comprehensive. Elrod needed to gather all the evidence about Wright and "[p]ut it all together." *Id.* at 156–57. He would then "bring it back" to Sneed and the two would go from there. *Id.* at 157.

Elrod did as Sneed requested. He revised his June report to include all the details of the investigation into the previous complaint against Wright, including the explicit photos and texts referring to "young" people that he and Sneed had already discussed. *Id.* But when Elrod later announced that he had completed his task and described the finished product, Sneed had changed his mind—he refused to take the new report. *Id.* at 158–590. "I don't want that," he said. *Id.* "That's too much" information. *Id.*

**D.      Elrod and Jenkins urged Chief Sneed to inform the D.A. about the investigations into Wright because of a pending trial involving Wright as an arresting officer, but Sneed refused and threatened to tell the D.A. that they were liars if they went behind his back.**

During the investigations into Wright, Jenkins had multiple conversations with Sneed about the matter. *Id.* at 186–88. Sneed was initially so concerned that he was skeptical of Wright's continued employment with the police department. "There's no way he survives this," Sneed once confided in Jenkins. *Id.* at 187.

But that soon changed. Jenkins—who had, like Sneed and Elrod, reviewed Wright's texts—began hearing Sneed make excuses for Wright. The "disturbing" text exchanges were no cause for alarm, Sneed would remark, because Wright "was just drunk" and playing along with someone he

was trying to seduce. *Id.* at 186–87. Sneed started voicing this position, Jenkins observed, after hearing it repeatedly from Billy Petty. *Id.* at 187–88.

The department's new stance on Wright's conduct was soon cemented when Jenkins received a subpoena for the criminal trial of Justin Whaley, a man who Wright had arrested for vehicular homicide. *Id.* at 195–96, 329. Wright's role in the arrest was significant—he claimed to have smelled alcohol coming from Whaley's vehicle at the scene, he arrested Whaley, he "was the only officer to observe" Whaley's "blood taken by a nurse," he "assume[d] custody of the blood," he "check[ed] it into evidence," and he "facilitate[d] its delivery to the TBI for analysis." *Id.* at 330.

Because of Wright's involvement in the Whaley case, Elrod and Jenkins believed that the department had an obligation to tell the Hamilton County D.A. about the investigations into Wright.*Id.*at 162–63, 172–74. They both believed that the results of the investigations negatively affected Wright's credibility, which in turn led them to believe that they were required by law to disclose it. *Id.* at 162–63, 172–74. And Jenkins was also concerned that he would be asked about Wright if he ultimately had to testify. *Id.* at 195. So they both approached Sneed about disclosing information to the D.A. before the Whaley trial. *Id.* at 160–61, 196–97.

Sneed refused. He and the city attorney had apparently concluded that the allegations against Wright "didn't hold no water," so there was nothing to disclose. *Id.* at 161.

But that wasn't all. If either Elrod or Jenkins disclosed any of the information about Wright to the D.A., Sneed would personally accuse them of lying: "If you do that, I'll call Coty Wamp and tell her you've perjured yourself." *Id.* at 160–61, 196.The Whaley trial therefore proceeded without Whaley, the D.A., or the Criminal Court knowing about the investigation into Wright or about Wright's dishonesty. *Id.* at 329–30. Whaley was ultimately convicted and sentenced to a nine-year term in prison. *Id.*

**E.    Elrod and Jenkins reported the information about Wright to the D.A., and, after their report led the defendant who Wright had arrested to move for a new trial, the Soddy Daisy City Manager expressed uncertainty about Jenkins's job security.**

After Chief Sneed retired in early 2024, Elrod and Jenkins revisited the Wright investigations. Jenkins approached the new police chief, Billy Petty, and asked him what was going to happen to Wright. *Id.* at 198–99. But Petty's only comment was that Wright was no longer "promotable." *Id.* Elrod and Jenkins also had multiple meetings with City Manager Burt Johnson about Wright, both to ensure that Johnson knew about the situation and to urge him to report it to the D.A. *Id.* at 164–65, 362–63. Johnson never committed to any course of action and eventually told them that he had been too busy with other things to "do anything about" it. *Id.* at 266–67, 364–65.

Having exhausted the options available to them in Soddy Daisy, Elrod and Jenkins took their concerns directly to District Attorney General Coty Wamp. *Id.* at 365–67. They explained how they had tried to comply with their chain of command and how Sneed had warned them against speaking with her. *Id.* They then disclosed everything in Elrod's reports about Wright's explicit texts, the Planet Fitness allegations, and the inconsistencies in Wright's stories about the pictures of himself on his phone. *Id.*

General Wamp was upset by what she heard and by the fact that the Soddy Daisy Police Department hadn't disclosed the information earlier. *Id.* at 201–202. Regardless, she apparently shared Elrod and Jenkins' position about the disclosure—her office immediately relayed the information about the Planet Fitness investigation to Whaley's attorney, who then filed a Petition for Writ of Error Coram Nobis with the Hamilton County Criminal Court. *Id.* at 328–30, 336–37.

Upon the filing of Whaley's petition, Elrod and Jenkins became unwelcome in the Soddy Daisy Police Department. No one talked to them. *Id.* at 166, 205. No one looked at them. *Id.* at 166. No one involved them in normal work activities. *Id.* They faced "total silence" from their coworkers. *Id.*

Jenkins—who had recently been promoted to Captain—met with Burt Johnson to discuss how he'd been shut out within the department and to express his fear about losing his job amidst the events surrounding Wright. *Id.* at 200, 203–04. But Johnson did not reassure him. When Jenkins

stated that his job was "in danger" because of what he would ultimately be asked to testify about at the hearing on Whaley's petition, Johnson confirmed that Jenkins' future was indeed uncertain. *Id.* at 439. Johnson said he didn't "know what's gonna happen" to Jenkins's job after the Whaley hearing and that he was going to "have to see what pressure's" applied to him "to do one [thing] or another." *Id.* at 439.

## F. Elrod and Wright testified at a Criminal Court hearing on Wright's credibility, and hours later the City suspended them over their testimony.

Criminal Court Judge Boyd Patterson conducted the first hearing on Whaley's petition in April 2024, at which both Elrod and Jenkins testified under the compulsion of subpoenas issued by Whaley. *Id.* at 315–16, 367, 388. During the April hearing, Elrod and Jenkins testified about the investigation into the Planet Fitness allegations against Wright and the inconsistencies in Wright's stories about the photographs he showed the complainants. *Id.* at 347–406. Sneed also testified at the hearing and claimed that he disagreed with Elrod and Jenkins' assessment of Wright's dishonesty during their investigation, chalking the matter up to a misunderstanding. *Id.* at 406–14.

During Sneed's testimony, Judge Patterson broadened the scope of the hearing. *Id.* at 418–29. He ruled that the investigation related to Wright's explicit texts and the pedophilia accusation, which had not previously been disclosed to the defense, was relevant alongside the Planet Fitness information. *Id.* Whaley, Judge Patterson concluded, should be able to review that material and amend his petition as he saw fit. *Id.* The hearing thus ended prematurely. *Id.*

Sneed had attended the hearing with Petty, and the two discussed Elrod and Jenkins on their way back to Soddy Daisy. *Id.* at 451. And then upon their return, Sneed and Petty went to see Johnson at his office at City Hall. *Id.* at 451–52. After they "closed the door" behind them, the three discussed, among other things, Sneed's desire for the city investigate Jenkins for statements he had allegedly made about Sneed, including an accusation of racism. *Id.*

A few hours later, Petty informed Elrod and Jenkins that Johnson had suspended them. *Id.* at 167–68, 254–56, 460. The reason Johnson cited for the suspension was that there was to be an investigation about their testimony at the Whaley hearing. *Id.*

**G.    The Criminal Court granted Whaley's petition, and less than two weeks later, Soddy Daisy fired Elrod and Jenkins.**

Soon after the Plaintiffs' suspensions, Whaley amended his petition to incorporate the additional information that he had learned about Wright, and Judge Patterson recommenced the hearing in May 2024.*Id.* at 433.. Sneed finished the testimony that he had begun in April, and Elrod and Jenkins both testified again to give further details about their investigation into Wright. *Id.* at 207–68. Judge Patterson took the matter under advisement.  *Id.* at 273–75.

By the time the second hearing was over, feelings toward Sneed and Elrod were openly hostile. They had "lied" at the hearings and falsely accused Wright of wanting "to have sex with a juvenile," among other things. *Id.* at 455–56. "They don't deserve to wear a badge," Sneed told Petty. *Id.* at 457–58.

Around six weeks later, Judge Patterson entered an order granting Whaley's petition. *Id.* at 433–37. He found that Elrod and Jenkins' testimony was "admissible impeachment evidence" that "carries significant credibility" and that, as such, it should have been disclosed to Whaley before his trial. *Id.* at 436–37.

But Judge Patterson did not simply acknowledge that the evidence should have been disclosed when Elrod and Jenkins originally urged Chief Sneed to act. He also acknowledged that the nondisclosure was the result of a significant, department-wide error. The problem was indicative of a "major facture" in the Soddy Daisy Police Department that, in Judge Patterson's view, "invoke[d] the arguable possibility that" the department "did not hold Sgt. Wright to the appropriate standards of care." *Id.*

Less than two weeks later, Soddy Daisy fired Elrod and Jenkins. According to their termination letters, the two had "developed a dislike" for Wright so severe that they concocted a "plan" to "ruin" his career by trumping up false allegations against him. *Id.* at 115, 118. Echoing what Sneed

had claimed earlier, the letters also stated that Elrod's report about Wright contained a misrepresentation—he had included statements about Wright wanting to have sex with someone "underage" or a "juvenile" even though neither of those two exact "quoted words were in the text messages." *Id.* at 115–16, 118–19. Further, Elrod and Jenkins had been insubordinate by not respecting the "chain of command" that should have ended with Sneed's refusal to disclose the Wright investigations to the D.A. *Id.*

## III. Discussion

### A. Under Rule 56, the Court must view the evidence and possible inferences from it in Elrod and Jenkins's favor and refrain from weighing the parties' competing proof.

The Defendants may obtain summary judgment if they prove that "there is no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because a summary judgment essentially "operates to deny a litigant his day in court," a Rule 56 motion should be granted "only with extreme caution . . . ." *Smith v. Hudson*, 600 F.2d 60, 63, (6th Cir. 1979). It is for this reason that the Court must consider the evidence, as well as any evidentiary inferences it can make from that evidence, "in the light most favorable to" Elrod and Jenkins. *Id.*

Under this cautious approach, the Court may not resolve the Defendants' Rule 56 motion by "weighing conflicting evidence" or "assess[ing] [its] probative value . . . ." *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 230 (6th Cir. 1990). So "even if" the Court "believes that the evidence presented by [Elrod and Jenkins] is of doubtful veracity," it must leave the resolution of "conflicting evidence" and witness credibility to the jury. *Snyder v. Kohl's Dep't Stores, Inc.*, 580 F. App'x 458, 461 (6th Cir. 2014); *Smith v. Ohio Nat'l Life, Ins. Co.*, No. 3:07-0655, 2008 U.S. Dist. LEXIS 23161, *16 (M.D. Tenn. March 24, 2008).

In other words, the Court may grant the Defendants summary judgment "only if the record shows that" they proved their claims "so clearly that no rational jury could have found to the contrary." *Snyder*, 580 F. App'x at 461. So long as Elrod and Jenkins can produce "more than a scintilla

of evidence" to support their positions, the Defendants' motion cannot succeed. *Loveday v. Sevier Cty.*, No. 3:98-CV-774 (Phillips), 2000 U.S. Dist. LEXIS 4016, at *47–51 (E.D. Tenn. Mar. 20, 2000) (denying summary judgment in a Political Freedom Act case).

**B.  There is evidence from which a jury could reasonably doubt the City's proffered reasons for terminating Elrod and Jenkins after they disclosed impeachment evidence about Wright.**

The City does not contest the Plaintiffs' prima facie cases under the Public Protection Act or the Political Freedom Act. Instead, it argues that those claims fail because there were legitimate, non-retaliatory reasons that Elrod and Jenkins were fired:

- o  First, the Plaintiffs were terminated because they gave "false or misleading" testimony to Judge Patterson. Elrod's alleged lie came when he testified that he "provided" his second report to Sneed in July 2023. This was false, the City claims, since Elrod later stated that Sneed refused to take the report after he offered it to him. Doc. 44 at PageID 364–65. And Jenkins's alleged lie was his testimony that "Wright produced a photo that depicted his penis" to Elrod. That was false since, according to the City, Elrod later said in a deposition that he never saw a picture of Wright's penis on Wright's phone. *Id.* at 357, 364.

- o  Second, the City fired Elrod and Jenkins because of their conduct toward their peers. There were, the City claims, "multiple reports that Elrod and Jenkins were both demeaning towards other officers . . . ." *Id.* at 364.

- o  And third, Jenkins was fired because he didn't disclose the entirety of his feelings about Billy Petty to Burt Johnson when Johnson raised the possibility of promoting Petty to Chief. *Id.*

But the simple fact that the City asserts a non-retaliatory animus for its action does not make it so. Rather, when an "employer proffers a non-retaliatory reason for [an] employee's discharge, 'the employee must have a full and fair opportunity to demonstrate that the employer's proffered reasons are pretextual . . . .'" *Williams v. City of Burns*, 465 S.W.3d 96, 118–19 (Tenn. 2015) (analyzing pretext in a Public Protection Act case); *Loveday v. Sevier Cty.*, No. 3:98-CV-774 (Phillips), 2000 U.S. Dist. LEXIS 4016, at *47-51 (E.D. Tenn. Mar. 20, 2000) (confirming that, "[e]ven assuming that defendants can demonstrate that there was cause for plaintiff's termination, plaintiff

must be given a fair opportunity to show that defendants' reasons for their actions were pretext" under the Political Freedom Act).

Whether an employer's stated reasons for termination are pretext "is a commonsense inquiry" meant to address a single basic question: "did the employer fire the employee for the stated reason or not?" *Wheeler v. Knox Cty.*, No. 3:16-cv-108, 2018 U.S. Dist. LEXIS 168692, at *22 (E.D. Tenn. Sep. 29, 2018) (analyzing pretext under the Public Protection Act). The analysis of that question often focuses upon three categories of proof about the "employer's proffered reasons"—(1) the reasons' "basis in fact," (2) the truth behind the employers' intent, and (3) the sufficiency of the stated reasons to justify termination. *Id.*

But at the summary-judgment stage, that analysis is not mechanical. Courts do not review "evidence in each of these categories in isolation" to ask whether a plaintiff did in fact "prove pretext" in their summary-judgment responses. *Goodwin v. Newcomb Oil Co.*, LLC, No. 23-5594, 2024 U.S. App. LEXIS 10239, at *15 (6th Cir. Apr. 26, 2024); *Patterson v. Spriggs Constr., LLC*, No. 2:24-cv-00002, 2025 U.S. Dist. LEXIS 162590, at *7-8 (M.D. Tenn. Aug. 21, 2025) (noting that a "plaintiff does not need to prove pretext" to survive a Rule 56 motion). Instead, courts simply "ask whether the evidence of pretext, when considered as a whole, is strong enough to 'cast doubt' on the employer's explanation." *Goodwin*, 2024 U.S. App. LEXIS 10239, at *15.

Further, the burden of marshalling enough evidence to establish that doubt "is not heavy." *George v. Youngstown State Univ.*, 966 F.3d 446, 462 (6th Cir. 2020) (confirming that "summary judgment is only warranted if no reasonable juror could conclude that the employer's offered reason was pretextual"). All that is necessary to entitle a plaintiff to a jury trial on the truth of an employer's non-retaliatory explanation is the existence of a "reasonable doubt"—"if the plaintiff 'has produced evidence from which a jury could reasonably doubt the employer's explanation,'" then "[s]ummary judgment is improper . . . ." *Goodwin*, 2024 U.S. App. LEXIS 10239, at *15. *See Moffat v. Wal-Mart Stores, Inc.*, 620 F. App'x 453, 459 (6th Cir. 2015) (cautioning courts to "exercise caution" when asked to grant summary judgment upon "a showing of pretext," acknowledging that "an employer's true motivations are particularly difficult to ascertain," and conceding that

decisions on pretext are "frequently . . . unsuitable for disposition at the summary judgment stage").

Here, there is more than enough proof to support a reasonable doubt about the City's proffered non-retaliatory explanations. First, the City's allegations of "false" and "misleading" testimony have little basis in fact. It claims that Elrod falsely stated that he "gave" his second report on Wright to Sneed in July 2023, but it failed to explain how any difference in Elrod's description of the same event in his deposition—that he offered the July report to Sneed, that the two had already discussed everything in it, and that Sneed refused to take it—amounted to a "misrepresentation" worthy of termination.

Likewise, the City's accusation that Jenkins lied while testifying is simply wrong. While Jenkins indeed said at the second corum nobis hearing that Wright ultimately showed Elrod "a different picture . . . that had his penis in it at the time," the City failed to note testimony immediately following Jenkins's statement that explained what he meant. Whaley's attorney asked if the "different picture" that Jenkins referred to was the one that had been previously "marked as Exhibit 2," and Jenkins confirmed that it was. JA 264. Exhibit 2 was a two-page exhibit showing the "cropped" nude photo of Wright from the waist up and the "uncropped" nude photo of Wright from the knees up "with his pelvic area exposed and a black spot over what appears to be part of his penis . . . ." *Id.* at 213–14. As Jenkins truthfully testified, Elrod had indeed seen all the photos in Exhibit 2 during his conversations with Wright. *Id.* at 250–51.

Beyond the fact that the alleged "lies" that the City claims as justification for the firings did not occur, the Court should also note that two other independent government actors have already confirmed the truth of Elrod and Jenkins's testimony. The D.A. found the Plaintiffs' statements credible enough to disclose them to Whaley's attorneys, openly conceding to Judge Patterson that Whaley "was entitled to this information" about Wright and that it "should have been disclosed pretrial." *Id.* at 336–37. And then Judge Patterson—who heard sworn testimony from Sneed that supports the City's position as well as sworn testimony from Elrod and Jenkins—found unequivocally that Elrod and Jenkins were credible witnesses whose disclosures should have been revealed

to the defense before trial. *Id.* at 436–37. The City is free to disagree with those assessments, and it is indeed true that neither Plaintiff is statutorily protected from being fired for lying to an elected official. *Robbins v. City of Johnson City*, No. E2000-02952-COA-R3-CV, 2001 Tenn. App. LEXIS 470, at *16–17 (Tenn. Ct. App. July 3, 2001) (no perm. app. filed) (recognizing that the Political Freedom Act does not protect employees from being fired for making "untrue" statements). But it is for the jury to weigh the City's competing assessment of credibility, not the Court under Rule 56. *Lindsey v. Shelby Cty. Bd. of Educ.*, No. 15-cv-2587-JTF-dkv, 2019 U.S. Dist. LEXIS 106396, at *9 (W.D. Tenn. Feb. 22, 2019) (rejecting a defendant's claim that summary judgment was warranted on a Political Freedom Act claim where a plaintiff's statements to an elected official were allegedly "untrue" and ruling that "[w]hether" a plaintiff's "communications" with "an elected official about job-related matters" under the Political Freedom Act "were true or not are factual issues for the jury").

Second, the City's claim that it fired the Plaintiffs because of reports of their "demeaning" behavior toward their peers in factually incongruous. Johnson claims to have received complaints about the Plaintiffs' "demeaning" conduct as early as December 2023. JA at 441–45. But he did not refer to those alleged complaints in the suspension notices that Elrod and Jenkins received the day they testified at the corum nobis hearing in April 2024, and the City presented no evidence that Elrod or Jenkins were ever demoted, reprimanded, investigated, or even written up for "demeaning" conduct in the interim.

And in fact, there is evidence that undermines any notion that the City viewed alleged complaints of demeaning conduct as significant. Numerous officers allegedly complained about demeaning conduct as early as December 2023, but Chief Petty promoted Jenkins to Captain in March 2024.*Id.* at 207–08. Another officer, Brandon Miller, allegedly faced complaints of similar conduct alongside Elrod and Jenkins, but the City did not discipline him when it suspended and ultimately fired the Plaintiffs after their testimony in the Whaley case. *Id.* at 441–42, 447–48, 449. And though Johnson claims that he received additional complaints about detrimental conduct after he suspended Elrod and Jenkins in April 2024, he doesn't recall having formal interviews with any

of those complainants and doesn't recall taking any notes from the "casual conversations" he had about these issues. *Id.* at 445–46.

Third, the circumstances surrounding Jenkins' alleged lack of candor about Petty's promotion undermine the City's position. Though it claims that Jenkins' failure to fully reveal his qualms with Petty's potential promotion was an independent ground for his termination, Johnson learned about Jenkins' feelings toward Petty before the first Whaley hearing in April 2024, months before his termination. *Id.* at 111–13. Further, the City fails to recognize that nothing in Jenkins' suspension notice mentions his alleged lack of candor about Petty, nor did it allow the possibility that a jury could give credence to Jenkins' explanation for the political reasons he did not speak out against Petty's promotion. *Id.* at 460.

Fourth, there is direct evidence that the proffered reasons relating to events that occurred before the Whaley hearings did not motivate—or at the very least were not the overriding reasons for—the Plaintiffs' termination. When Johnson spoke with Jenkins days before the April 2024 hearing, he had already allegedly heard complaints about demeaning conduct and he knew that Jenkins had not fully expressed his misgivings about Petty before Petty's promotion. And yet when Jenkins asked about his job security, Johnson mentioned neither of those things. Instead, he tied Jenkins' job security solely to potential fallout from the testimony he might give at the Whaley hearing. *Id.* at 449.

And fifth, the timing of the Plaintiffs' suspensions and ultimate firings undermines the City's position. The City suspended Elrod and Jenkins the same day that they testified at the corum nobis hearing before Judge Patterson. And then it fired them less than two weeks after Judge Patterson entered an order confirming the relevance of the Plaintiffs' testimony, commending their credibility, and overturning the conviction of the man that Wright arrested. Coupled with the rest of the Plaintiffs' evidence, the "suspicious timing" of those events "is a strong indicator of pretext" in this case. *Wheeler v. Knox Cty.*, No. 3:16-cv-108, 2018 U.S. Dist. LEXIS 168692, at *22 (recognizing in a Public Protection Act case that even though the "temporal proximity" of the adverse

action and protected conduct "cannot be the sole basis for a finding of pretext, suspicious timing is a strong indicator of pretext when it is accompanied by other, independent evidence").

**C.    The Defendants did not move for judgment on two of the conspiracy claims against Sneed, but even if they had, there is evidence of his participation in the City's violations of the Public Protection Act and Political Freedom Act.**

Though Elrod and Jenkins asserted three civil conspiracy claims against Mike Sneed in their Amended Complaint—one for conspiracy to violate 42 U.S.C. § 1983, one for conspiracy to violate the Public Protection Act, and one for conspiracy to violate the Political Freedom Act, Doc. 11 at PageID 90, 92, 94—Sneed has moved for judgment on only one of them. According to the Defendants' brief, Sneed cannot be liable for conspiracy to violate § 1983 for two reasons. First, he is immune under the intracorporate-conspiracy doctrine for liability for any conspiratorial acts he took during his employment with the City, and second, he is not liable for his post-employment conduct because "there is no evidence that Sneed participated in any conspiracy to deprive the Plaintiffs of their constitutional rights." Doc. 44 at PageID 360–61.

There are no similar arguments, however, on the other conspiracy claims. The Defendants discuss the allegations of conspiracy to violate the Public Protection Act or Political Freedom Act in their brief, but the only thing they argue is that the individual defendants are immune under the intracorporate conspiracy doctrine. *Id.* at PageID 363–64, 365.

That argument therefore cannot apply to Sneed—who is not the City's employee and was not one when the Plaintiffs were suspended or terminated—and thus the claims against him for conspiracy to violate the Public Protection Act and Political Freedom Act are unaffected by the Defendants' motion.

Even if the Defendants had argued in their brief that those other conspiracy claims against Sneed should fail, however, the result would be no different. Through the tort of civil conspiracy, Tennessee law imputes liability for the conduct of an "active wrongdoer" upon anyone "who planned, assisted, or encouraged the wrongdoer's acts." *Stanfill v. Hardney*, No. M2004-02768-COA-R3-CV, 2007 Tenn. App. LEXIS 620, at *22–23 (Tenn. Ct. App. Sep. 27, 2007). Here, there

is ample evidence from which a juror could infer that Sneed "planned, assisted, or encouraged" the City's conduct after he retired from the Soddy Daisy Police Department. *Id.* at \*25–26 (noting that "it is unlikely that direct evidence of a conspiratorial agreement will exist" given the "secret" nature of conspiracies and confirming that circumstantial evidence alone is sufficient to support a conspiracy claim so long as it allows a juror "to infer that two or more persons jointly assented to accomplish an unlawful purpose").

After Elrod and Jenkins testified before Judge Patterson in April 2024, Sneed discussed the Plaintiffs' testimony as he and Petty drove back to the Police Department. JA 451–52. He then met with Petty and Johnson behind closed doors at the Soddy Daisy City Hall to discuss, among other things, his desire for the City to investigate Jenkins, a meeting that immediately preceded the Plaintiffs' suspensions pending an investigation into their testimony. *Id.* at 167–68, 451–52. He agreed with the City's decision to suspend the Plaintiffs and spoke with Petty multiple times about the matter after the suspension. *Id.* at 453–54. . And then after the Plaintiffs testified before Judge Patterson again, he told Petty that he believed the two should lose their badges, which is exactly what happened after Judge Patterson issued his order granting Whaley's motion. *Id.* at 457–58.

So, to the extent that the Defendants moved for summary judgment on the Plaintiffs' conspiracy claims against Sneed for the City's violations of the Public Protection Act and Political Freedom Act, the Court should deny their motion.[1]

### IV. Conclusion

After hearing much of the same proof that this Court will review as it considers the Defendants' motion, Judge Patterson realized that at this dispute's heart is a disparity in how the Soddy Daisy Police Department treated its officers. The officer who has been the subject of multiple

---

[1] The Plaintiffs do not contest that the speech implicated by their § 1983 claim was likely employee speech rather than private speech, nor do they contest that Johnson and Petty are likely immune from direct or indirect liability for violations of the Public Protection Act and Political Freedom Act. So the Plaintiffs do no oppose summary judgment of their § 1983 claims in their entirety, their direct claims against Johnson under the Public Protection Act and Political Freedom Act, and their conspiracy claims against Johnson and Petty under those two acts.

investigations, who has been considered by his superiors to be unpromotable and unfit to be around minors, has continued his employment without incident. And yet the two officers who investigated him were suspended the day they spoke openly about their peer and fired soon after their concerns were validated in court.

The "fracture" that Judge Patteson observed continues in this litigation. The City persists in framing Elrod and Jenkins as bad actors out to ruin Wright at any cost. And Wright, whose acts were so severe that they compelled an independent prosecutor to jeopardize her conviction and a judge to order a new trial? His culpability and trustworthiness are notably absent from the City's briefing.

But ignoring the fracture that Judge Patterson identified, along with all the evidence that supports the Plaintiffs' positions, does not entitle the City to summary judgment nor does it make the City's explanations for its actions any less doubtful. The proof shows that Elrod and Jenkins had significant, legitimate concerns about Wright's character and credibility that they believed should have been disclosed to prosecutors. It shows that their superiors at the City ultimately minimized those concerns, protected Wright from any discipline, and tried to bar the disclosure of information to those who might need to know it. And it shows that Elrod and Jenkins where suspended and fired immediately after they went against their superiors' wishes even though both the Hamilton County District Attorneys' Office and the Hamilton County Criminal Court validated their concerns.

Those are not the circumstances of a retaliation case fit for summary judgment. A jury should hear all the facts alongside the City's invocation of alternative explanations for the Plaintiffs' firings. The Court should therefore deny the Defendants' motion to the extent that it seeks summary judgment of the Plaintiffs' claims under the Public Protection Act and Political Freedom Act against the City and the Plaintiffs claims against Sneed for conspiracy with the City to violate those Acts.

Respectfully Submitted by

PATRICK, BEARD, SCHULMAN & JACOWAY, P.C.

By: _/s/Lance W. Pope_____
     Lance W. Pope, BPR No. 025054
     R. Jonathan Guthrie, BPR No. 020762
     537 Market Street, Suite 300
     Chattanooga, Tennessee 37402
     Telephone: (423) 756-7117
     Facsimile: (423) 267-5032
     lpope@pbsjlaw.com
     jguthrie@pbsjlaw.com

DAVIS & HOSS, P.C.

By: _/s/ E. Logan E. Davis_____
     Edith Logan Davis BPR No. 038138
     **DAVIS & HOSS, P.C.**
     850 Fort Wood Street
     Chattanooga, TN 37403
     logan@davis-hoss.com
     *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of this pleading has been served on all interested parties, including but not limited to the parties listed below, via the Court's electronic filing system.

Keith H. Grant
Philip Aaron Wells
**ROBINSON, SMITH & WELLS, PLLC**
Suite 700, Republic Centre
630 Chestnut Street
Chattanooga, TN 37450
kgrant@rswlaw.com
awells@rswlaw.com

This 18th day of September, 2025.

Patrick, Beard, Schulman & Jacoway, P.C.

By: _/s/Lance W. Pope_____
     Lance W. Pope